UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------- X
EVERETT B. MCMILLAN,                                       :
                                                          :    **MEMORANDUM**
                              Petitioner,                 :    **DECISION AND ORDER**
                                                          :
              - against -                                 :    19-cv-1748 (BMC)
                                                          :
RAYMOND SHANLEY, Superintendent                          :
Cocksackie C.F.,                                          :
                                                          :
                              Respondent.                 :
---------------------------------------------------------- X

**COGAN**, District Judge.

Petitioner seeks habeas corpus relief under 28 U.S.C. § 2254 from his conviction upon a

jury verdict for Criminal Possession of a Weapon in the Second Degree (N.Y. Penal Law

§ 265.03(3)); Criminal Possession of a Weapon in the Third Degree (N.Y. Penal Law

§ 265.02(1)); and Unlawful Possession of Marijuana (N.Y. Penal Law § 221.05).  The facts will

be set forth below as necessary to address each of petitioner's points of error, but to summarize,

NYPD detectives from the Queens Warrant Squad – having been previously assigned to

apprehend petitioner on the basis of an active parole warrant – received a call from petitioner's

girlfriend, Sheila Parker Settles ("Parker"), that petitioner and her twenty-year-old son, Timothy

Settles ("Settles"), were in petitioner's car approaching his apartment and that there was a gun in

the car.  The detectives executed the warrant at petitioner's apartment, taking him into custody

and confiscating his car keys, and when they opened his car to move it from blocking the

driveway, they saw a fully-loaded gun protruding from a backpack that belonged to him in the

backseat.

Reading his habeas corpus petition broadly (as parts of it are represented and parts are *pro se*), petitioner reprises four of the points of error from his state court challenges to his conviction: (1) the recovery of the gun from the car violated petitioner's Fourth Amendment rights; (2) his trial counsel had a conflict of interest which rendered him constitutionally ineffective in representing petitioner; (3) petitioner was denied his right to confront witnesses when detectives were allowed to testify to part of the contents of a telephone conversation; and (4) the prosecution violated petitioner's rights under Brady v. Maryland, 373 U.S. 83 (1963), by not producing a firearm history report that would have allegedly exculpated him, and his counsel was ineffective in not investigating the provenance of the firearm on the basis of this report.

The first of these points is not subject to review on federal habeas corpus. The second is procedurally barred. The other two do not satisfy the standard for relief required by the Anti-Terrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254 ("AEDPA"). Accordingly, the petition is denied.

## I.      Fourth Amendment Claim

### A.  Background

On direct appeal, petitioner asserted that the gun seized from his car had to be suppressed because the officer seizing it did not have a search warrant, thereby violating petitioner's rights under the Fourth Amendment. The motions court rejected his claim on the merits after a hearing. The Appellate Division affirmed, as did the New York Court of Appeals after granting leave to appeal. People v. McMillan, 130 A.D.3d 651, 12 N.Y.S.3d 301 (2d Dep't 2015), aff'd, 29 N.Y.3d 145, 53 N.Y.S.3d 590 (2017).

**B.  Analysis**

In Stone v. Powell, 428 U.S. 465 (1976), the Supreme Court held that federal habeas corpus review is unavailable for Fourth Amendment claims where the petitioner has had the opportunity to fully litigate the claim in state court: "[W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial."  Id. at 494.  The Supreme Court reasoned that, in the habeas context, "the contribution of the exclusionary rule, if any, to the effectuation of the Fourth Amendment is minimal, and the substantial societal costs of application of the rule persist with special force."  Id. at 494-95.

Based upon Stone, the Second Circuit has held that habeas review of decisions implicating the exclusionary rule is limited to situations in which "the state provides no corrective procedures at all to redress Fourth Amendment violations," or where there is a corrective procedure "but in fact the defendant is precluded from utilizing it by reason of an unconscionable breakdown in that process … ."  Gates v. Henderson, 568 F.2d 830, 840 (2d Cir. 1977) (en banc) (cleaned up).  Courts have repeatedly recognized that New York State provides an adequate corrective procedure for Fourth Amendment claims.  See, e.g., Capellan v. Riley, 975 F.2d 67, 70 (2d Cir. 1992); Guzman v. Greene, 425 F. Supp. 2d 298, 318 (E.D.N.Y. 2006); Crispino v. Allard, 378 F. Supp. 2d 393, 413 (S.D.N.Y. 2005).  For this reason, courts within this Circuit have almost uniformly held that challenges to a state court's rulings as to the application of the exclusionary rule are not reviewable under Stone v. Powell.  See, e.g., Marino v. Superintendent, Franklin Correctional Facility, No. 17-cv-1650, 2019 WL 1232088, at *4-5 (E.D.N.Y. March 15, 2019); Coleman v. Racette, No. 15-cv-4904, 2019 WL 948401, at *9-10

(S.D.N.Y. Feb. 2, 2019); Doll v. Chappius, No. 15-cv-6400, 2018 WL 6310191, at *9

(W.D.N.Y.  Dec. 3, 2018); Wilson v. Graham, No. 17-cv-0863, 2018 WL 6001018, at *5-6

(N.D.N.Y. Nov. 15, 2018); Holley v. Cournoyer, No. 17-cv-587, 2018 WL 3862695, at *4-5 (D.

Conn. Aug. 14, 2018); Ala v. Vermont, No. 10-cv-221, 2011 WL 1843045, at *4 (D. Vt. April 4,

2011).[1]

Here, there is no question of the adequacy of the state law remedy.  Petitioner moved and

fully litigated the Fourth Amendment issues through a hearings court and both levels of state

appellate review.  The New York Court of Appeals, in fact, granted leave to appeal this issue and

wrote a detailed decision on it.  Under these circumstances, and applying the authorities, the state

courts have provided a full and fair opportunity to raise his Fourth Amendment claim, and there

is no reason for this Court to exercise its discretion by undertaking a further level of review.

## II.    Confrontation Clause Claim

### A.  Background

The pretrial hearing disclosed that after the police had attempted to arrest petitioner at his

apartment and found that petitioner was not there, Parker later frantically called the police in

response to a text she had received from Settles saying that he was in petitioner's car going to

petitioner's apartment and that petitioner had a gun.  Parker's call to the police described the text

---

[1] In Young v. Conway, 698 F.3d 69 (2d Cir. 2012), the Second Circuit exercised its discretion to decline application
of Stone v. Powell and undertook a review of the merits of a Fourth Amendment claim where the District Attorney
had failed to raise Stone v. Powell in the district court.  The Circuit held that Stone v. Powell is a prudential and
equitable, not jurisdictional, doctrine that can therefore be waived.  However, in support of its holding of the non-
jurisdictional nature of Stone v. Powell, the Circuit cited Davis v. Blackburn, 803 F.2d 1371 (5th Cir. 1986)
(per curiam).  See Young, 698 F.3d at 86 n. 10.  Davis, like all other cases that have considered the issue, also held
that a federal court, in the exercise of discretion, may raise Stone v. Powell *sua sponte*.  See, e.g., United States. v.
Ishmael, 343 F.3d 741, 742-43 (5th Cir. 2003); Herrera v. Lemaster, 225 F.3d 1176, 1178 (10th Cir. 2000); Tart v.
Massachusetts, 949 F.2d 490, 497 n.6 (1st Cir. 1991); cf. Woolery v. Arave, 8 F.3d 1325, 1326-27 (9th Cir. 1993)
(contrary to Young v. Conway, holding that district court must raise Stone v. Powell *sua sponte* even if the State
does not).  Because I have raised Stone v. Powell *sua sponte* as a matter of discretion prior to any submission by
respondent on petitioner's Fourth Amendment claim, there is no issue of waiver.

4

and told the police that petitioner was going to petitioner's apartment in petitioner's car with a gun.

At trial, the court limited the prosecution as to the evidence concerning the call.  The prosecution was permitted to offer evidence that the police had a warrant and that they received a phone call telling them that petitioner was returning to his apartment in his car (so that the jury wouldn't think the police just showed up out of the blue).  However, the trial court precluded testimony that Parker had mentioned a gun, that Settles had texted Parker, the substance of the phone call, that the warrant was a parole warrant, or that Parker's tone on the call after receiving the text was frantic.  The prosecutor adhered to these instructions, but also started to bring out that as the detectives approached the door, they had their guns drawn.  The court sustained defense counsel's objection mid-question.

In his *pro se* brief on direct appeal and in this proceeding, petitioner contended that the half-asked question about the telephone call violated his right to confrontation under the Sixth Amendment because he had not been permitted to cross-examine Parker about what she had told the police.  The Appellate Division held that this argument was "unpreserved for appellate review and, in any event, without merit."  McMillan, 130 A.D.3d at 654, 12 N.Y.S.3d at 305 (citations omitted).

### B.  Analysis

Since Parker's out-of-court statement was never admitted into evidence, it is hard to see how petitioner's Confrontation Clause rights were violated.  Even if it had been, however, the Appellate Division's invocation of a procedural bar would preclude habeas corpus review of the ruling in this Court.

A federal court should not address the merits of a petitioner's habeas claim if a state court has rejected the claim on "a state law ground that is independent of the federal question and adequate to support the judgment." Lee v. Kemna, 534 U.S. 362, 375 (2002) (quoting Coleman v. Thompson, 501 U.S. 722, 729 (1991)) (emphasis omitted). When a state court rejects a petitioner's claim because he failed to comply with a state procedural rule, the procedural bar may constitute an adequate and independent ground for the state court's decision. See, e.g., Coleman, 501 U.S. at 729-30; Murden v. Artuz, 497 F.3d 178, 193 (2d Cir. 2007). State procedural grounds are only adequate to support the judgment and foreclose federal review if they are "firmly established and regularly followed" in the state. Murden, 497 F.3d at 193 (quoting Monroe v. Kuhlman, 433 F.3d 236, 241 (2d Cir. 2006)).

Further, if a state court rejects a specific claim on an adequate and independent state law ground, then a federal court should not review the merits of the claim, even if the state court addressed the merits of the claim in the alternative. See Harris v. Reed, 489 U.S. 255, 264 n. 10 (1989) ("[A] state court need not fear reaching the merits of a federal claim in an *alternative* holding. By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law.") (internal citation omitted).

It is well-settled that New York's contemporaneous objection rule, codified at N.Y. Crim. Proc. Law § 470.05(2), is an independent and adequate state law ground that ordinarily precludes federal habeas corpus review. See, e.g., Downs v. Lape, 657 F.3d 97, 103-04 (2d Cir. 2011). New York's contemporaneous objection rule provides that a party seeking to preserve a claim of error at trial must lodge a protest to the objectionable ruling "at the time of such ruling . . . or at any subsequent time when the [trial] court had an opportunity of effectively changing the same."

N.Y. Crim. Proc. Law § 470.05(2).  This rule has been interpreted by New York courts to require, "at the very least, that any matter which a party wishes" to preserve for appellate review be "brought to the attention of the trial court at a time and in a way that gave [it] the opportunity to remedy the problem and thereby avert reversible error."  People v. Luperon, 85 N.Y.2d 71, 78, 623 N.Y.S.2d 735, 738-39 (1995); see also People v. Hicks, 6 N.Y.3d 737, 739, 810 N.Y.S.2d 396, 398 (2005).

New York law is also clear that an objection to an out-of-court statement on the ground that it is hearsay does not preserve an objection that the statement violates the Confrontation Clause of the Sixth Amendment.  See Davis v. Lee, No. 13-cv-3827, 2015 WL 1379024, at *5 (S.D.N.Y. March 25, 2015) ("[I]t is well-settled law in New York that the invocation of a hearsay objection is insufficient to preserve a Confrontation Clause violation.") (quoting Bryant v. Lempke, No. 08-cv-6103, 2010 WL 3063073, at *5 (W.D.N.Y. Aug. 2, 2010)); People v. Kello, 96 N.Y.2d 740, 743-44, 723 N.Y.S.2d 111, 113 (2001); cf. United States v. Dukagjini, 326 F.3d 45, 60 (2d Cir. 2003) ("[A] defendant's claim that he was deprived of a fair trial because of the admission in evidence of a statement objectionable as hearsay would not put the court on notice that the defendant claimed a violation of his constitutional right to be confronted by his accusers.") (quoting Daye v. Attorney Gen. of New York, 696 F.2d 186, 193 (2d Cir. 1982) (en banc)).

In the instant case, although trial counsel's objections were fervent and frequent, the only ground he mentioned was hearsay.  The trial court had no ability to determine that petitioner wanted it to make an analysis of the subject evidence under the Confrontation Clause.  The Appellate Division's ruling that the claim was unpreserved was thus fully consistent with both New York law and federal habeas corpus law.

Once it is determined that a habeas petitioner's claim is procedurally barred under state procedural rules, however, a federal court may still review such a claim on the merits if the petitioner can demonstrate both cause for the default and prejudice resulting therefrom, or if he can demonstrate that the failure to consider the claim will result in a miscarriage of justice.  See Coleman, 501 U.S. at 750; Harris, 489 U.S. at 262.  The latter avenue, a miscarriage of justice, is demonstrated in extraordinary cases, such as where a constitutional violation results in the conviction of an individual who is actually innocent.  See Murray v. Carrier, 477 U.S. 478, 496 (1986).

The first avenue, cause for the default and prejudice therefrom, can be demonstrated with "a showing that … the procedural default is the result of ineffective assistance of counsel." Bossett v. Walker, 41 F.3d 825, 829 (2d Cir. 1994) (quoting Murray, 477 U.S. at 488).  However, the ineffective assistance claim must itself have been exhausted in the state court. Edwards v. Carpenter, 529 U.S. 446, 451-52 (2000).  To adequately exhaust a claim, a petitioner must have "fairly presented" the claim to the state court.  Daye, 696 F.2d at 191.

Although petitioner raised various ineffective assistance of trial counsel claims, either on direct appeal or in his two C.P.L. § 440.10 proceedings, he never contended that his trial counsel was ineffective for failing to raise a Confrontation Clause claim.  He therefore cannot rely on an ineffective assistance of counsel argument to avoid the procedural bar.  See Edwards, 529 U.S. at 451-52.

Nor is there any miscarriage of justice in applying the procedural bar.  Indeed, my view is that the trial court was more protective of petitioner than the Confrontation Clause required it to be, as it likely would have been proper to admit the entirety of Parker's call as an excited utterance.  See Mungo v. Duncan, 277 F. Supp. 176, 184 (E.D.N.Y. 2003).  Whether viewed as a

hearsay issue or a Confrontation Clause issue, the record shows that Parker excitedly called the police because petitioner was approaching her home with a gun (and her son), not to further any pending prosecution.  See Brown v. Keane, 355 F.3d 82, 87-90 (2d Cir. 2004).

The call was thus plainly non-testimonial and therefore did not implicate the Confrontation Clause.

## III.     Ineffective Assistance of Counsel Due to Conflict of Interest

### A.  Background

At arraignment, petitioner was represented by Attorney Christopher Maffia.  Thereafter, he was represented by Attorney Edwin Ira Schulman through trial and sentencing.  Petitioner already knew Schulman because Schulman had been appointed to represent petitioner under 18-B of the New York County Law ("18-B") in a prior, unrelated assault case, where a grand jury had determined not to indict petitioner.

The trial court's ruling limiting the prosecution's ability to introduce Parker's telephone call to the police apparently gave rise to a conflict in strategy between Schulman and petitioner.  Although petitioner never expressly stated what his problem was – saying only that he wanted all the facts about the arrest to come out – a close reading of the record shows that the strategic disagreement came down to one point: petitioner wanted introduced into evidence the substance and circumstances of Parker's calls that had caused the detectives to go to his apartment, effectively undoing the court's restrictive rulings.  Schulman thought introduction of the calls would be prejudicial because they showed that Settles had texted his mother, Parker, that petitioner had a gun in his car; that Parker was frantic when she made the call; and that Settles had become worried and concerned that petitioner had a gun – all of which would corroborate

9

the prosecution's case.  In addition, petitioner, against Schulman's advice, had already testified

before the grand jury that the gun did *not* belong to Settles, and to present evidence to the

contrary at trial would contradict that testimony.

Although Schulman raised the existence of a strategic conflict before the first witness

(the arresting officer, Detective Herlihy) testified, moving to withdraw and for a mistrial, the

conflict was not fully fleshed out until the trial proceeded.  Schulman raised the conflict several

times more.  Like petitioner, Schulman did not precisely articulate the specifics of the

disagreement.  But the trial court's comments and colloquy with petitioner make it clear that the

trial court became aware early on of Schulman's concern that following petitioner's strategy

would open the door to the above-referenced evidence by undoing the *in limine* rulings, and that

introduction of the calls from Parker would be prejudicial.

The trial court denied Schulman's motions to withdraw and for a mistrial.  Instead, it

offered to have a hearing if petitioner would write down the questions he wanted Schulman to

ask, and then, outside the presence of the jury, the trial court would hear the questions and

possibly direct Schulman to ask them.

But the issue was not raised again.  At the end of Herlihy's testimony, the trial court

inquired whether there was anything else petitioner wanted to raise before the Court brought the

jury in – implicitly alluding to its earlier offer of a hearing without the jury – but petitioner did

not indicate that he wanted to pursue the issue any further.  Herlihy's testimony continued

through cross and redirect; the prosecution called its remaining witnesses and rested; and

petitioner did not put on a case.  Petitioner was then convicted.

However, prior to sentencing, Schulman again moved to withdraw.  According to the

transcript, the motion was based on a *pro se* motion to set aside the verdict that petitioner had

filed under N.Y. Crim. Pro. Law § 330.30 (which is not in my record) asserting, in part, that Schulman was ineffective in unspecified ways; that he had an unidentified conflict of interest; and that he had coerced petitioner not to testify at trial.  The court granted the motion to withdraw and directed the assignment of 18-B counsel.

There is then another gap in my record because about two months later, the case was recalled for sentencing, and Schulman appeared for petitioner again.  (The District Attorney refers to a letter from the trial court noting that Schulman would continue to represent petitioner but that is not in my record either.)  There was no discussion in the transcript about why another lawyer had not been appointed pursuant to 18-B or how Schulman came to appear for petitioner after being granted leave to withdraw due to a conflict.

In any event, petitioner rejected a sentencing agreement that the prosecution had proposed, and sentencing was adjourned for two more months.  It took two more lengthy sentencing hearings, in which Schulman continued to represent petitioner without reference to the earlier conflict, to pronounce a sentence because petitioner, through Schulman, contested some or all of his prior convictions as predicates for persistent violent felony offender status, but the trial judge rejected them and sentenced petitioner to 20 years to life in custody as a persistent violent felony offender.

After the Court of Appeals affirmed his conviction, petitioner brought his first § 440 motion, asserting that Schulman had deliberately failed to lay the gun off on Settles because Schulman had been paid by Parker, Settles's mother, to represent petitioner, and thus Schulman did not want to act contrary to Parker's and her son's interests.  Petitioner claimed that before the suppression hearing, he had told Schulman that Settles "cannot be a defense witness" because "[t]he backpack containing the gun belonged to him; what are you going to do about that

revelation?"  In his first § 440 motion, petitioner transmogrified his disagreement with Schulman at trial from whether Parker's phone calls should have been admitted into evidence into a disagreement over whether the gun should have been laid off on Settles.

Petitioner claimed that he had spoken to Settles and that Settles told petitioner that Schulman had told Settles to "lay low" until after the trial or else Settles would be arrested for the gun.  Petitioner asserted that even as of the first day of trial, he did not know that Parker had retained Schulman, but thought that Schulman's 18-B appointment in his prior case had continued into this one.  Petitioner claimed he did not learn that Parker had retained Schulman until after he was convicted.

Petitioner described the strategic disagreement between Schulman and him as petitioner wanting to show that the gun belonged to Settles, but Schulman was trying to protect Settles out of loyalty to Settles's mother, Parker, who had paid him.  Petitioner said that the reason Parker had called the police was because her relationship with petitioner had broken down.

According to a detailed affidavit that Schulman submitted in opposition to petitioner's first § 440 proceeding, Parker had contacted him and told Schulman that petitioner wanted him to represent petitioner again.  Schulman met with Parker who paid him a fee and thus retained him, subject to petitioner's approval, although there was no written retainer agreement. Schulman averred in his affidavit that

> [t]he assertion by Mr. McMillan that he did not know that [Parker] retained me is not accurate.  When I met Mr. McMillan after being retained by [Parker] we discussed the retainer, who was responsible to pay the fee since he was incarcerated, and my continued representation of him in both the criminal matter and the upcoming Parole Revocation hearing.

Schulman further averred that petitioner "knew from the moment I stepped into this case that I had been retained by Ms. Sheila Parker to represent him and that it was at his request." According to Schulman, in their initial conversations, petitioner asserted that the gun was not his. Petitioner told Schulman that Settles was a witness to the events and could be helpful, and he urged Schulman to be in touch with Parker to help prepare his defense.

Schulman's affidavit further recited how he had advised petitioner not to testify before the grand jury, and how petitioner had disagreed.  Indeed, in his testimony before the grand jury, petitioner admitted that the car was his; that there was only one set of keys which he had; and that he regularly kept his possessions in his car.  Petitioner also testified before the grand jury that he knew nothing about the gun but, crucially for the purposes of the instant petition, he knew it did not belong to Parker or Settles.

Schulman's affidavit makes clear that petitioner's grand jury testimony, even if inculpatory, was consistent with what petitioner told him before he testified.  That is, petitioner never discussed with Schulman the possibility of raising a defense that the gun belonged to Parker's son, Settles.

Schulman denied that his strategic disagreement with petitioner was over implicating Settles, but, rather, it was that introducing Parker's phone calls to the police officers would have further incriminated petitioner.  He noted, as the trial record reflects, that he repeatedly offered to ask the questions that petitioner wanted him to ask if petitioner would put the questions in writing, so that he (Schulman) could not be accused of ineffective assistance for opening the door to incriminating evidence (even though this would have opened the door to the inculpatory information).

The first § 440 court denied the motion, holding:

> The defendant has failed to set forth sworn allegations of fact substantiating his allegation that his trial attorney Edwin Ira Schulman failed to present evidence that the weapon that he was convicted of possessing was actually the property of another and that Mr. Schulman was advised of that by the defendant. In opposition, the People have annexed as exhibits the transcript of the defendant's Grand Jury testimony which is in conflict with the defendant's current position and the affirmation of the defendant's attorney Mr. Schulman. In testimony before the Grand Jury the defendant denied that the gun was owned by the person who he now alleges was the owner. In his affirmation Mr. Shulman denies the defendant's allegations of conflict of interest and denies that he had knowledge that the gun was possessed by the person identified by "Timothy."

(cleaned up). The Appellate Division subsequently denied petitioner leave to appeal.

### B. Standard of Review

As he asserted in his first § 440 motion, petitioner contends here that he was deprived of the effective assistance of counsel because Schulman had divided loyalty – unbeknownst to petitioner, he had been paid by Parker to protect Settles at petitioner's expense. As quoted above, the first § 440 court rejected that argument.

In reviewing that decision, two principals of habeas corpus review control my analysis. As an initial matter, because the first § 440 court decided this point on the merits, its decision attracts the provisions of 28 U.S.C. § 2254(d)(1). That statute requires petitioner to demonstrate that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."

The decision of a state court is "contrary" to clearly established federal law within the meaning of § 2254(d)(1) if it is "diametrically different" from, "opposite in character or nature," or "mutually opposed" to the relevant Supreme Court precedent. Williams v. Taylor, 529 U.S. 362, 405-06 (2000) (internal quotation marks omitted). A state court decision involves "an

14

unreasonable application" of clearly established federal law if the state court applies Supreme

Court precedent to the facts of the case "in an objectively unreasonable manner." Brown v.

Payton, 544 U.S. 133, 141 (2005).

Relief under this "objectively unreasonable" prong, however, is not easily obtained. "In

applying § 2254(d)(1) … we bear in mind that 'unreasonable' is not synonymous with

'incorrect.'" Serrano v. Fisher, 412 F.3d 292, 297 (2d Cir. 2005) (quoting Williams, 529 U.S. at

410-11). Rather, a petitioner must show that the state court's decision was "so lacking in

justification that there was an error well understood and comprehended in existing law beyond

any possibility for fairminded disagreement." Harrison v. Richter, 562 U.S. 86, 103 (2011); see

also Garner v. Lee, 908 F.3d 845, 861 n. 14 (2018) (noting that in light of Harrison, the standard

previously articulated by prior Second Circuit decisions as "some increment of incorrectness

beyond error … [although] the increment not be great," citing Francis S. v. Stone, 221 F.3d 100,

111 (2d Cir. 2000), has not survived). In addition, the phrase "clearly established [f]ederal law,

as determined by the Supreme Court … refers to holdings, not dicta," of Supreme Court

decisions, and does not encompass Court of Appeals or district court decisions. Evans v.

Fischer, 712 F.3d 125, 133 (2d Cir. 2013) (quoting and citing Williams, 529 U.S. at 410-11).

Thus, the Supreme Court has made clear that the AEDPA standard of review is extremely

narrow, and is intended only as "a guard against extreme malfunctions in the state criminal

justice systems, not a substitute for ordinary error correction through appeal ... ." Ryan v.

Gonzales, 568 U.S. 57, 75 (2013) (internal quotation marks omitted). "A state court's

determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded

jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter,

562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Indeed,

since Harrington, the Supreme Court has repeatedly admonished lower courts for not affording

sufficient deference to state court determinations.  See, e.g., White v. Wheeler, 577 U.S. 73, 76-

77 (2015) ("This Court, time and again, has instructed that AEDPA, by setting forth necessary

predicates before state-court judgments may be set aside, 'erects a formidable barrier to federal

habeas relief for prisoners whose claims have been adjudicated in state court'" (quoting Burt v.

Titlow, 571 U.S. 12, 15-16 (2013)).  The Supreme Court in Harrington went so far as to hold that

a habeas court may only "issue the writ in cases where there is no possibility fairminded jurists

could disagree that the state court's decision conflicts with [the Supreme Court's] precedents."

562 U.S. at 102; see also Cavazos v. Smith, 565 U.S. 1, 6-7 (2011).

The second principle of habeas corpus review applicable here is the presumption of

correctness for factual findings of the state court – "a determination of a factual issue by a State

court shall be presumed to be correct. The applicant shall have the burden of rebutting the

presumption by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).  This principle

encompasses implied as well as express findings of fact.  See Marshall v. Lonberger, 459 U.S.

422, 434-35 (1983) (state court's failure to expressly determine a witness's credibility still

required presumption of correctness that it deemed witness credible); see also Channer v.

Brooks, 320 F.3d 188, 194 (2d Cir. 2003); Whitaker v. Meachum, 123 F.3d 714, 715 n.1 (2d Cir.

1997).  Factual findings entitled to deference can be implicit as well as explicit.  See Ventura v.

Meacham, 957 F.2d 1048, 1055 (2d Cir. 1992).

### C.  The Alleged Conflict of Interest

I cannot find that petitioner's claim is either contrary to, or an unreasonable application

of, any United States Supreme Court authority.  Ineffective assistance of counsel claims are

evaluated under Strickland v. Washington, 466 U.S. 668 (1984).  A defendant must show that

counsel's representation "fell below an objective standard of reasonableness" based on "prevailing professional norms," and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 687-88, 694.  Strickland defined a "reasonable probability" as "a probability sufficient to undermine confidence in the outcome."  Id. at 694.

Under AEDPA, a state habeas petitioner claiming ineffective assistance of counsel must show that the state court "applied Strickland to the facts of his case in an objectively unreasonable manner."  Bell v. Cone, 535 U.S. 685, 698-99 (2002); Aparicio v. Artuz, 269 F.3d 78, 99 (2d Cir. 2001) ("Under AEDPA we inquire only whether the [state court's] rejection of this claim amounted to an unreasonable application of Strickland.").

There are several Supreme Court decisions addressing conflicts of interest worth considering here.  First, in Wood v. Georgia, 450 U.S. 261 (1980), petitioners, employees of an adult bookstore, were convicted of violating obscenity laws.  They were sentenced to a fine and probation and were released to probation on condition of paying the fine over time.  When they did not pay, the court held a probation violation hearing.  Petitioners showed that they did not have the money to pay the fine, and the court thereupon sentenced them to custody.  The issue upon which the Supreme Court granted certiorari was whether it was a violation of the equal protection clause to impose jail time on defendants who could not afford to pay a fine but not on defendants who could.

The Supreme Court, however, declined to reach the issue.  It noted that there was substantial evidence in the record suggesting that the petitioners' employer (the bookstore) had hired their lawyer and had determined, for the purpose of creating a test case, to seek a ruling that its employees could not be jailed for failing to pay fines beyond their means.  The Supreme

17

Court also noted that it appeared the trial court may have been aware of, and participated in, the employer's strategy, as it deliberately set the fines higher than the petitioners' means rather than modifying them to an amount they could pay.

The Supreme Court held that the trial court should have held a hearing to determine if the employees had a lawyer that was representing their interests instead of that of their employer. Indeed, the prosecutor had asked for a hearing for that purpose but the trial court declined. The Supreme Court, noting that it was "difficult for this Court to determine whether an actual conflict of interest was present, especially without the benefit of briefing and argument on this issue," remanded the case to conduct such a hearing. Id. at 272.

There are at least two reasons why the first § 440 court's decision in the instant case was neither contrary to, nor an unreasonable application of, Wood.

First, Woods' discussion of the possibility of a conflict was dicta. The issue was not directly before the Court; it was not the basis upon which the Court granted certiorari; and the Court acknowledged that it did not have the record or briefing upon which to decide whether there was a disqualifying conflict. By definition, Supreme Court dicta cannot clearly establish federal law. Rather, "[c]learly established Federal law" refers to "the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision." Green v. Travis, 414 F.3d 288, 296 (2d Cir. 2005) (alterations omitted) (quoting Williams, 529 U.S. at 412). Because there was no record on the potential conflict issue in Woods, that case does not "clearly establish" either that a possible conflict existed, that an actual conflict existed, or that it is a non-waivable conflict anytime a third party pays a defendant's attorneys' fees and the third party's interest potentially does not align with the defendant's.

Second, there is a key factual difference between this case and <u>Woods</u>.  Regardless of the dispute between petitioner and Schulman in the first § 440 proceeding over whether petitioner knew that his girlfriend, Parker, had retained Schulman, there is nothing in the record suggesting any reason that the prosecutor or the trial judge might have thought that Schulman's loyalty went to Parker and that Schulman was trying to protect Settles at petitioner's expense.  In <u>Woods</u>, the trial court knew or had reason to know of the potential conflict – it was aware that the employer was paying the petitioners' legal fees.

In the analogous context of multiple representation, which the Supreme Court has recognized can readily give rise to conflicts of interest, the Court has held that "nothing in our precedents suggests that the Sixth Amendment requires state courts themselves to initiate inquiries into the propriety of multiple representation in every case."  <u>Cuyler v. Sullivan</u>, 446 U.S. 335, 346 (1980).  Even more clearly, nothing in the Supreme Court precedents requires state courts to initiate a conflict inquiry because a third party, unbeknownst to the trial court, is paying a defendant's attorney's fees.  That would require an inquiry into the source of payment in every case where an attorney is retained rather than appointed.

To be sure, as petitioner here points out, the state court here knew that there was some kind of conflict between Schulman and petitioner – Schulman requested to withdraw based on it several times.  But the transcript makes clear that there was no reason for the trial court to believe it was a conflict of *interest*; rather, it was a conflict of *strategy*.  Petitioner wanted to undo the *in limine* rulings that Schulman had obtained at the suppression hearing and request that the Court admit the hearsay statements of Parker and the double hearsay statements of Settles (through Parker) to the police.  Schulman wanted to keep those out as he thought they incriminated petitioner, especially in light of petitioner's grand jury testimony denying that the

gun belonged to Settles.  And, in any event, the trial court expressed its willingness to direct Schulman to open the door anyway if petitioner would just write down the questions he wanted asked so that there would be no later ineffective assistance claim for Schulman's poor judgment in asking them – which petitioner ultimately did, and petitioner seemed satisfied for the trial court not to open the door further.  A conflict in strategy is not a sufficient reason to appoint new counsel, especially after a jury has been selected and opening statements have been made.  See United States v. Chinnici, 431 F. Supp. 470, 484 (D. Vt. 2019) (citing United States v. Williams, 372 F.3d 96, 106 (2d Cir. 2004)).

Thus, the decision of the first § 440 court was neither contrary to nor an unreasonable application of Woods.

The other Supreme Court decision that warrants mention is Mickens v. Taylor, 535 U.S. 162 (2002), where the petitioner's attorney had previously represented the victim, charged in an unrelated matter, that petitioner was accused of murdering. The trial judge was aware of the overlap as he had presided over both the prior charges against the victim and the charges against the petitioner, and saw the same attorney representing both, but did not conduct an inquiry as to the potential for a conflict.  The issue before the Supreme Court was whether the failure to conduct the hearing required automatic reversal, or whether the petitioner still had to prove prejudice.  The Supreme Court held that prejudice was still required.

Mickens has little to do with the instant case because, again, there is nothing in the record suggesting that the trial court knew, or should have known, that Schulman was being paid by Parker.

In addition, the first § 440 court's rejection of petitioner's ineffective assistance argument was necessarily based on its decision to credit Schulman's affidavit testimony that petitioner

knew that Parker had retained him, and to not credit petitioner's denial of such knowledge.  That triggers the presumption of correctness for factual findings under § 2254(e)(1).  Petitioner has not overcome that presumption because all of the circumstantial evidence renders incredible his protestation that he thought Schulman was appointed.

First, the suppression court inquired about the retention on the record and Schulman confirmed, in petitioner's presence, that he was retained.  Petitioner expressed no surprise at that, and the first § 440 court implicitly found he was on notice of it at that early stage, if not earlier, as Schulman asserted.

Second, petitioner's theory that Schulman was either "inherited" or "coincidentally appointed" based on Schulman's representation of him in a prior matter makes no sense. Petitioner had an appointed lawyer in this case – Christopher Maffia, who appeared for petitioner (and no doubt was appointed at that time) at arraignment.  He was thereafter replaced with Schulman.  That was not by magic, and petitioner, who had considerable experience with the New York criminal justice system and 18-B in particular, undoubtedly knew that someone had to pay Schulman to get him there.

All of this gave credence to Schulman's affidavit that petitioner knew he was retained, and formed a strong basis for the first § 440 court's determination to accept Schulman's version, not petitioner's, and to further accept Schulman's explanation that the conflict addressed at trial was as to strategy, not interest.  It further supported Schulman's statement that petitioner had never told Schulman that the gun might belong to Settles.  So did petitioner's testimony to the grand jury, in which he denied that the gun belonged to Settles.

In sum, the first § 440 court's implicit finding that petitioner's conflict of interest argument was a post-conviction creation by petitioner either because he had a falling out with

Parker, or he thought Settles was out of the woods, or he just wanted a way out of his conviction, is a factual determination entitled to deference.

Petitioner's attempts to avoid this conclusion are not convincing.  First, he contends that the § 440 court did not decide the merits of his argument, and thus its decision is not entitled to AEDPA deference.  I disagree.  There was only one issue before the first § 440 court and it denied the motion that raised the issue.  Harrington makes clear that even the statement "motion denied," standing alone, is sufficient for AEDPA purposes to constitute a decision on the merits. 582 U.S. at 99.  Only where a decision expressly invokes a procedural bar will it be deemed to be a non-merits determination.  See Reyes v. Ercole, 785 F. App'x 26, 27 (2d Cir. 2019) ("Absent a clear and express statement of reliance on a state procedural bar, we presume that a cursory state court decision rests on the merits of the federal claim.") (cleaned up).

Second, petitioner mischaracterizes the first § 440 court's actual and implied findings of fact as mixed questions of law and fact.  There is nothing mixed about them.  The first § 440 court's decision was certainly not on a procedural ground.  And it said much more than "motion denied."  It expressly held that petitioner had failed to present sufficient evidence that the gun belonged to Settles or that petitioner had told Schulman to advance such a defense – since petitioner's and Schulman's submissions were diametrically contradictory, the first § 440 court effectively discredited petitioner's version of the facts.  It noted that petitioner had testified that the gun did not belong to Settles before the grand jury – thus contradicting petitioner's position on the first § 440 motion.  By reciting Schulman's version of what had happened, the § 440 court adopted that as the factual basis for its decision.  I therefore reject petitioner's claim that the first § 440 court's decision was not on the merits.

IV.     **The <u>Brady</u> and Attendant Ineffective Assistance Claims**

A.  **Background**

Subsequent to the filing of the instant petition, petitioner made a second § 440 motion in state court making two related arguments: (1) the prosecutor had violated petitioner's rights under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963),  by not producing a "Firearms Trace Summary Report" prepared by the Bureau of Alcohol, Tobacco and Firearms in 2009 (the "ATF Report"), showing that, in 2001, the gun in question had been purchased by a man named Brent Everette Wallace in Georgia; and (2) Schulman failed to investigate and learn that there was an ATF Report, and if he had, he might have found that the gun belonged to Settles.[2]

The second § 440 court found that the prosecution was in possession of the ATF Report as early as August 2009, but had not produced it to defendant in discovery.  The court also noted that Settles was in Georgia on probation for a felony until the month before petitioner was arrested; that petitioner's theory was that the gun had made its way from Wallace to Settles sometime after 2001; and that Settles, once he left Georgia, had brought the gun into petitioner's car, leading to petitioner's arrest.

Accordingly, the second § 440 court found that the petitioner had satisfied the <u>Brady</u> condition that the evidence was suppressed, as the District Attorney's office  had "all but concede[d]" that point by admitting it had the report in its possession in August 2009 but did not disclose it until petitioner's first § 440 proceeding.  However, the court found that the ATF Report was neither exculpatory nor material.  It reasoned that all the evidence showed was that

---

[2] Because petitioner only learned of the ATF Report after he brought his first § 440 motion in 2018 (the District Attorney had submitted it in opposition to that motion), which was after he brought the instant petition, this Court stayed the petition until exhaustion of those claims in an Order dated February 10, 2020.  <u>See</u> <u>Rhines v. Weber</u>, 544 U.S. 269, 277-78 (2005).

eight years prior to the gun being found in the backpack of petitioner's car, the gun had been bought by a person in Georgia who had no known connection to Settles, and that Settles happened to be in Georgia at that time (when he was then about twelve years old).  It regarded this as too speculative to rise to the level of being exculpatory.  It also noted that in addition to being charged with actual possession of the gun, petitioner was charged with constructive possession, which meant that even if the gun belonged to Settles, its presence in the back of petitioner's car would have made petitioner guilty as well.

In addition, the second § 440 court rejected petitioner's argument on the facts.  It found that petitioner's theory of defense that the gun belonged to Settles made no sense factually for reasons similar to those upon which petitioner's first § 440 motion was denied.  It noted that it was Parker who had called the police and reported that petitioner had a gun in the car and that it was Settles who had texted her alerting her to petitioner's gun ("It would defy credulity to believe that Mr. Settles would text his mother about his own gun.").  The second § 440 court further noted, again, that petitioner had testified to the grand jury, against Schulman's advice, that the gun did not belong to Settles and that he kept his possessions inside his car.

Finally, the second § 440 court rejected petitioner's ineffective assistance of counsel claim against Schulman, finding, first, that Schulman could not have investigated a report that the prosecution had not produced, and even if Schulman had the report, with petitioner denying that the gun belonged to Settles, there was nothing before the second § 440 court to suggest that Schulman would have found any exculpatory information.

### B.  Analysis

Under Brady v. Maryland and its progeny, habeas corpus relief is appropriate if three conditions are met with regard to evidence not produced to an accused prior to conviction: "The

evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281-82 (1999). It follows *ipso facto* that not all suppressed evidence that is favorable to an accused will also be material to the question of the guilt or innocence of the accused. See Turner v. United States, 582 U.S. 313, 323-24 (2017). Evidence goes from being merely favorable to the accused to material only "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985); see also Turner, 582 U.S. at 324-25; Kyles v. Whitley, 514 U.S. 419, 435 (1995) (evidence is material when it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict").

Here, I cannot say that the second § 440 court's conclusion was contrary to or an unreasonable application of any of these Supreme Court precedents. Fair-minded jurists could certainly think that petitioner's argument – that because the gun was in Georgia with a third party (Wallace) when Settles was twelve years old, eight years before petitioner's arrest, could lead the jury to infer that the gun belonged to Settles, not petitioner – was entirely speculative, as the second § 440 court found. There was no evidence before the second § 440 court that the twelve-year-old Settles had any connection to Wallace or about what Wallace had done with the gun after he bought it. Indeed, the connection between Wallace and Settles was so nonexistent that had Schulman tried to introduce it at trial to show that the gun belonged to Settles (a strategy, as the first § 440 court found, that petitioner had all but foreclosed by testifying before the grand jury that the gun was not Settles's), the trial court may well have excluded it to avoid confusing the jury.

Perhaps recognizing this, petitioner took the argument one step further, contending that if the prosecution had produced the ATF Report (as it should have) to Schulman, Schulman could have conducted further investigation and *that* would have led him to evidence of the gun belonging to Settles. And then he attempted to take it yet another step, contending that because Schulman did not investigate the provenance of the gun, he was constitutionally ineffective. But these additional steps just make it worse. Each step piles speculation on speculation. The second § 440 court did not run afoul of <u>Brady</u> and its progeny by rejecting such an attenuated theory.

Finally, the second § 440 court had to evaluate petitioner's theory against the totality of the evidence in the case. To accept that theory, it would first have to find a reason why petitioner testified to the grand jury that the gun did not belong to Settles. Second, it would need a reason, one that the suppression court had not been able to find, to believe Settles when he denied at that hearing that he had texted his mother, Parker. That would leave unanswered the question of how Detective Herlihy learned where petitioner was and that he had a gun in his car. Third, it would have to disbelieve Schulman, whose affidavit clearly averred that petitioner never suggested to him that the gun belonged to Settles. Fourth, it would leave unexplained why Settles was texting his mother that petitioner had a gun in the car if the gun belonged to Settles.

In the instant habeas proceeding, petitioner advances counterfactual arguments to show that the evidence could be viewed differently. But this is not a *de novo* review. As explained above, the second § 440 court's factual findings are presumptively correct absent clear error to the contrary. At most, there are alternative explanations that petitioner has come up with, but with the second § 440 court having reasonably rejected them, there is no basis for habeas relief.

**CONCLUSION**

The petition is denied.  The Court will issue a certificate of appealability only as to the third point of error – ineffective assistance due to conflict of interest – as the reach of Supreme Court authority on that issue is not well-defined and the record on that point is not without ambiguity.  *In forma pauperis* status is granted to plaintiff for purposes of appeal.

**SO ORDERED.**

*Brian M. Cogan*
_____
U.S.D.J.

Dated: Brooklyn, New York
       August 28, 2024